# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO. **09-21385**

| | |
|---|---|
| ELECTRI INTERNATIONAL – THE FOUNDATION FOR ELECTRICAL CONSTRUCTION, INC., | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| KROLL INC. and KROLL ASSOCIATES, INC., | : <br> : <br> : |
| Defendants. | : |

CIV-KING MAGISTRATE BANDSTRA

FILED by _____ D.C.

MAY 2 1 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## COMPLAINT

1. Plaintiff ELECTRI International – The Foundation for Electrical Construction, Inc. ("Plaintiff" or "ELECTRI") sues Defendants Kroll, Inc. and Kroll Associates, Inc. (collectively "Defendant Kroll") for gross negligence, breach of contract, and indemnification and states:

### NATURE OF ACTION

2. On February 16, 2009, the Securities and Exchange Commission ("SEC") filed a civil action (the "SEC Action") in the United States Federal Court for the Northern District of Texas against Stanford International Bank ("SIB"), Stanford Group Company ("SGC"), Stanford Capital Management, LLC (together with SGC and SIB, "Stanford"), R. Allen Stanford ("Mr. Stanford"), James M. Davis, and Laura Pendergest-Holt, alleging that these parties committed a multi-billion dollar fraud, which the SEC characterized as "a fraud of shocking magnitude that has spread its tentacles throughout the world." SEC Press Release: *SEC Charges R. Allen Stanford, Stanford International Bank for Multi-Billion Dollar Investment Scheme*, Feb. 17,

2009, http://www.sec.gov/news/press/2009/2009-26.htm. The SEC filed an Amended Complaint on February 27, 2009. The SEC's Amended Complaint alleges that Mr. Stanford, along with the other defendants named in the SEC Action, through Stanford entities "executed a massive Ponzi scheme."

3. Plaintiff ELECTRI, a nonprofit public foundation that funds, conducts, coordinates, and monitors the electrical construction industry's most critical research, commissions, and training programs, was a victim of this scheme and the Stanford fraud, losing millions of dollars.

4. ELECTRI retained Defendant Kroll to evaluate the soundness of SIB and its management.

5. Defendant Kroll marketed itself as an investigative firm possessing "unique expertise" and a "highly credentialed" team of consultants.

6. Defendant Kroll purportedly conducted an investigation from which it issued a due diligence report that gave a positive review of SIB and a green light to invest.

7. Defendant Kroll's due diligence report failed to reveal what industry experts have called "major, major, major red flag[s]" with respect to SIB and its management that, according to a Defendant Kroll employee, would have been discovered with even a "cursory check."

8. ELECTRI reasonably relied on Defendant Kroll's due diligence report, and, as a result, ELECTRI continued to maintain its investments in SIB certificates of deposit ("CDs") and even invested further in SIB CDs.

9. ELECTRI has lost its entire investment in SIB CDs, for a total loss of $6,363,455.72, which included the principal amount it had invested in SIB CDs plus the interest it had earned on the CDs from the dates it purchased the CDs through June 25, 2007, the date Defendant Kroll submitted its positive final due diligence report to ELECTRI.

10. This devastating loss could have been prevented had Defendant Kroll done its job with the requisite care.

## THE PARTIES

11. Plaintiff ELECTRI is a nonprofit public foundation that is incorporated in the State of Maryland and maintains its principal place of business in Bethesda, Maryland. ELECTRI was founded in 1989 by The National Electrical Contractor's Association, Inc. ("NECA") to fund, conduct, and coordinate critical research and commissions for the electrical construction industry responsible for lighting, power, and communications systems in buildings and communities across the United States.

12. Upon information and belief, Kroll Inc. was incorporated in the State of Delaware and is a subsidiary of Marsh & McLennan Companies, Inc. Kroll Inc. maintains its principal place of business in New York and has offices in more than 65 cities in over 33 countries. Upon information and belief, Kroll Associates, Inc. was incorporated in the State of Delaware and is a subsidiary of Kroll Holdings, Inc., which is a subsidiary of Marsh & McLennan Companies, Inc.

13. Upon information and belief, Kroll Inc. is the new corporate name of Kroll Associates, Inc. According to Kroll Inc.'s website, Kroll Associates, Inc. changed its name to Kroll Inc. in August 2001. See Kroll Inc. – About Kroll, http://www.kroll.com/news/media/krollfactsheet.pdf. The contract between ELECTRI and Defendant Kroll confirms ELECTRI's engagement of Kroll Associates, Inc. but is signed by Kroll Inc.

14. Defendant Kroll is a risk consulting company that provides various investigative, financial, security, and intelligence services to help clients reduce their exposure to risk and protect their assets. Defendant Kroll maintains an office in Miami, Florida, which serves as the

headquarters of its Latin America operations. It is this Miami office from which Defendant Kroll conducted the investigation.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332, in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is diversity of citizenship between Plaintiff ELECTRI and Defendant Kroll.

16.  This Court has personal jurisdiction over Kroll Inc. based on § 48.193(1)(a) of the Florida Statutes and Kroll Inc. having the requisite minimum contacts with the State of Florida to satisfy due process requirements.

17. This Court has personal jurisdiction over Kroll Associates, Inc. because Kroll Associates, Inc. has a registered agent in the State of Florida, and Kroll Associates, Inc. has the requisite minimum contacts within the State of Florida to satisfy due process requirements.

18.    Venue in this District is proper pursuant to 28 U.S.C. §1391(a)(1) because Defendant Kroll resides in this District, as residency of a corporation is defined in 28 U.S.C. §1391(c).

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

### ELECTRI Hires Defendant Kroll to Conduct a Due Diligence Investigation of SIB

19.  In October 2005, ELECTRI's Board of Trustees passed a resolution authorizing ELECTRI to establish accounts with SIB. This resolution went into effect in December 2005. Between December 30, 2005 and January 16, 2006, ELECTRI invested a principal amount of $5,495,000 in ten SIB CDs.

20.  In October 2006, ELECTRI's Board of Trustees established an Investment Review Task Force to review the endowment's investments. In January 2007, ELECTRI's Investment

Review Task Force held a meeting at which the group requested additional information about, among other things, ELECTRI's investment in SIB CDs.

21.    To assist the efforts of the Investment Review Task Force, ELECTRI hired Defendant Kroll to conduct an independent investigation of SIB in order to gain a level of comfort with SIB and its affiliates.

22. ELECTRI reasonably believed, based on Defendant Kroll's representations, that it could rely on Defendant Kroll to investigate SIB and its principals thoroughly using its superior knowledge, capabilities, and experience.  ELECTRI further believed that it could rely upon Defendant Kroll's investigation to determine whether to maintain its investments and invest further in Stanford and SIB.

23. On April 18, 2007, ELECTRI executed an engagement letter (the "contract"), which was signed by Kroll Inc., confirming the engagement of Kroll Associates, Inc.  This contract is attached hereto as Exhibit A.  Pursuant to this contract, Defendant Kroll was to "perform a Due Diligence/Reputational investigation concerning what is known as Stanford International Bank, Antigua." Ex. A. at ¶ 1.  The objective of the investigation was "to determine, from a risk-return evaluation standpoint, if ELECTRI International's investment in Stanford International is a profitable addition." Ex. A at ¶ 1.

**Defendant Kroll Agrees to Perform Extensive Due Diligence**

24.    As part of this due diligence, Defendant Kroll promised to determine SIB's reputation, compliance with banking regulations, whether SIB was being managed professionally, and whether SIB was the subject of any legal actions by any government entity. See Ex. A at ¶ 1.

25.  Defendant Kroll also promised to provide its opinion on how SIB compared with other U.S. and international banks of a similar size.  <u>See</u> Ex. A at ¶ 1.

26.  In addition, any reasonable investigation with an objective of evaluating "from a risk-return standpoint" whether maintaining investments with SIB was a "profitable addition," <u>see</u> Ex. A. at ¶ 1, would necessarily require a close examination of Mr. Stanford, sole shareholder of SIB, and an inquiry into entities that were also owned by Mr. Stanford and closely affiliated with SIB.

27.  In conducting the investigation, Defendant Kroll promised that it would perform the following:

    a.  Search media and other reference sources to identify any adverse media or negative indicators as to the institution's reputation.

    b.  Review independent and regulatory audits and examinations that determine the soundness of the institution and their compliance with regulatory requirements.

    c.  Review bank year-end reports, analyze income statements and balance sheets, and review the bank's credit risk and interest rate risk.

    d.  Contact members of Kroll's human bankers network who are familiar with Caribbean Banks in particular.

    e.  Conduct litigation checks to determine whether or not the bank or Mr. Stanford in Antigua is the subject of any legal actions.

    f.  Contact local and federal law enforcement agencies to determine whether or not this bank is under any significant investigative suspicion for criminal acts or money laundering by the bank, or any of their employees or executives.

Ex. A at ¶ 2.

28.   Pursuant to the contract, ELECTRI agreed to pay $15,000 for completion of the investigation, plus additional expenses, including out-of-pocket expenses, database usage fees, and an allocation of administrative service costs equal to 7% of the amount charged for professional fees to cover costs, such as telecommunications, reproduction, and other administrative costs. See Ex. A at ¶ 5.

29.   The contract contained a provision that stated:

> You [ELECTRI] agree to hold harmless and indemnify us [Kroll] (including our officers, employees and agents) against all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of the Assignment, <u>except for such claims, damages and costs resulting from any actions by us constituting gross negligence, fraud, willful or unlawful conduct or a breach of the terms of this Agreement.</u>
>
> \*\*\*
>
> You [ELECTRI] agree that neither we [Kroll], our affiliates, our representatives, nor our employees will be liable for any claims, liabilities or expenses relating to this engagement for an amount in excess of the aggregate amount paid by you to us pursuant to this engagement, <u>except to the extent resulting from our gross negligence, fraud, willful or unlawful conduct.</u> In no event will we or our affiliates, our representatives or our employees be liable to you for consequential, special, indirect, punitive or exemplary losses, damages or expenses relating to this engagement.

Ex. A at ¶ 3. (Emphasis added.)

## Defendant Kroll Misses Numerous Red Flags and Issues a Clean Report

30.   On May 11, 2007, Defendant Kroll submitted the first draft of its due diligence report to ELECTRI. Upon review of the report, ELECTRI had concerns that the report did not include updated audit and internal examination information; that certain of Defendant Kroll's conclusions were vague and not factually supported; that there was nothing negative about Stanford; and, if there was a negative observation, it was based on assumptions, rumors, or generalizations instead of facts. Ms. Laura Capuco, a NECA employee assigned to work for ELECTRI, requested that Defendant Kroll expand the "Risk Considerations" portion of the

report with more definitive, factual information presenting the positive and negative considerations directly attributed to SIB, as well as further elaboration of other portions of the report that lacked specificity, such as defining "largely compliant" with International Monetary Fund ("IMF") standards.

31. Defendant Kroll's response to these immediate concerns was that the draft report was not final, and more detail would be provided once Defendant Kroll received complete reports and internal and external audit reviews. Defendant Kroll's response to other questions, such as an explanation of SIB's compliance with IMF standards, remained vague. This unresponsiveness and lack of detail seemed to characterize Defendant Kroll's approach to the ELECTRI engagement and continued even after ELECTRI's initial reaction to the draft report.

32. Defendant Kroll submitted the Final Draft report on May 21, 2007. After reviewing the report, Mr. Russell Alessi ("Mr. Alessi") of ELECTRI submitted a memo to Defendant Kroll expressing further concern that the report's positive comments about SIB "seemed to be based on fact and the negative comments are based on generalizations about banks outside the US regulatory system." The memo highlighted specific portions of the report for which additional information was required, stressing that "I do not believe you or we are ready to accept this as a 'final' report."

33. One month later, on June 25, 2007, Defendant Kroll submitted its positive final report ("Final Report") of its due diligence investigation, which is attached hereto as Exhibit B.

34. In its Final Report, Defendant Kroll gave SIB a clean bill of health. Defendant Kroll represented that there was no disciplinary history, no pertinent litigation, no negative information from the Financial Action Task Force or other law enforcement entities in the U.S., Antigua, and Barbuda, and no negative findings or mention by Senator Carl Levin of Michigan, who had been

working to control money laundering through U.S. banks and had compiled a list of "Offshore Secrecy Jurisdictions" that included Antigua and Barbuda. See Ex. B at 3.

35.   The only issue raised in Defendant Kroll's Final Report was that SIB offered higher interest rates than similar institutions. Specifically, in its Final Report, Defendant Kroll noted, "Competitors and critics allege that it is impossible to pay the higher interest rates earned by clients of SIB." Ex. B at 10. Defendant Kroll provided no factual information to verify this assertion. However, Defendant Kroll then countered this criticism with the following statement: "Their arguments are valid, only to the extent that U.S. regulations require 'approved investments' which are not required by the Antiguan regulatory agencies." See Ex. B at 10. Upon information and belief, Defendant Kroll did not further investigate the high interest rates, despite the fact that there was no explanation as to how SIB could offer such high rates.

36.   Defendant Kroll listed SIB's Board of Directors as of June 2007, which included Sir R. Allen Stanford and James M. Davis, who are named defendants in the SEC Action. See Ex. B at 5. Defendant Kroll represented that it "could not find any adverse publicity regarding the bank's Management Team or Board of Directors." Id.

37.   Defendant Kroll's Final Report states: "SIB is wholly owned by Stanford International Bank Holding, LTD., which in turn is owned 100% by Allen Stanford." Defendant Kroll failed to conduct a reasonable investigation of Mr. Stanford and failed to include in its Final Report any detailed findings, negative or otherwise, related to Mr. Stanford.

38. Defendant Kroll's Final Report does not indicate that Mr. Stanford was tied to a number of other related entities and fails to include any analysis related to SIB's connection with other Stanford entities, which, like SIB, are controlled by Mr. Stanford. Further, not only does Defendant Kroll's Final Report fail to indicate any negative findings related to Mr. Stanford or

the affiliated entities, but it fails to highlight that a conflict of interest might exist due to Mr. Stanford's connection with all of these entities. Any reasonably conducted due diligence investigation would have included an inquiry regarding Mr. Stanford and the other closely-affiliated Stanford entities that he owns and controls.

39. Defendant Kroll's Final Report also fails to mention or explain Mr. Stanford's widespread network of contacts and financial control over the island of Antigua and how these circumstances could impact the authenticity of any audit.

40. In its Final Report, Defendant Kroll summarizes SIB's 2006 annual report and includes a statement from auditors C.A.S. Hewlett & Co. Ltd., Chartered Accountants St. Johns Street, St. Johns, Antigua, confirming that the SIB financial statement is a fair representation of SIB's financial position. See Ex. B at 7. Upon information and belief, Defendant Kroll did not investigate further the tiny Antiguan-based auditing company, nor did it further investigate the accuracy of SIB's financial statements.

41. Defendant Kroll concludes its Final Report by stating: "Kroll believes that SIB has a solid history, with no adverse publicity, litigation, or regulatory concern regarding the management of its customer funds and assets. However, given the nature of the bank and the fact that it is less stringently regulated, it is inherently a greater risk." Ex. B at 10.

42. Defendant Kroll's Final Report fails to include any analysis related to SIB's connection with the other Stanford entities, which, like SIB, are controlled by Mr. Stanford, or any investigation or detailed information related to Mr. Stanford.

43. By June 25, 2007, the date on which Defendant Kroll submitted the Final Report, ELECTRI's initial ten SIB CDs had a total market value of $6,088,455.72.

44. On July 31, 2007, Mr. Alessi forwarded Defendant Kroll's Final Report to ELECTRI's Investment Review Task Force. In the memo attached to the Final Report, Mr. Alessi informed the Investment Review Task Force of additional comments that Defendant Kroll's investigators had made in a conference call after Defendant Kroll's analysis and Final Report were completed. He stated: "their investigators explained that the examination of SIB resulted in an extremely positive report because there are no negatives. Kroll acknowledged that few banks would come through their investigation resulting in no known adverse items to report."

45. On August 20, 2007, in preparation for the October 2007 Board of Trustees meeting, the Investment Review Task Force held a meeting to discuss the members' investigation efforts regarding ELECTRI's investments, which included a discussion about Defendant Kroll's Final Report. If Defendant Kroll had done a reasonable investigation and reported negative information about SIB, its affiliates, or its management, the Investment Review Task Force, at a minimum, would have engaged in additional inquiry about SIB and Stanford.

46. At the October 2007 Board of Trustees meeting, Mr. Alessi provided a report on the Investment Review Task Force's efforts. As part of this report, Mr. Alessi explained that Defendant Kroll had been hired to conduct an independent due diligence investigation of SIB and had submitted a positive report in which it gave SIB a clean bill of health.

47. If Defendant Kroll had done a reasonable investigation and reported negative information about SIB, its affiliates, or its management, ELECTRI would have redeemed its SIB CDs and put the funds in other investments. Although ELECTRI would have incurred a withdrawal penalty for such early redemption, this penalty would have been satisfied from a

portion of ELECTRI's investment earnings, and ELECTRI would have ultimately retained an amount greater than the principal it had initially invested in the SIB CDs.

48.   Instead of redeeming its CDs, ELECTRI decided to invest further with SIB and purchased an additional SIB CD in October 2007 for $275,000. If Defendant Kroll had done a reasonable investigation and reported negative information about SIB, its affiliates, or its management, ELECTRI would not have invested more money in SIB CDs.

49.   Instead of conducting a reasonable investigation and reporting negative information about SIB, its affiliates, or its management, Defendant Kroll submitted a falsely positive report upon which ELECTRI reasonably and foreseeably relied in deciding to maintain its SIB investments and then later investing additional money in another SIB CD. In total principal amount, ELECTRI invested $5,770,000 in eleven SIB CDs. By June 25, 2007, ELECTRI's initial ten SIB CDs had matured to a total market value of $6,088,455.72.

50. As a direct and proximate result of Defendant Kroll's gross negligence and breach of contract, ELECTRI lost the entire principal amount it had invested, plus the interest it had earned through the date it received Defendant Kroll's Final Report, for a total of $6,363,455.72.

51. In addition, Defendant Kroll's gross negligence directly impacted ELECTRI's annual spending policy contained within the Foundation's Investment Policy Statement, which determines the funding limits for ELECTRI's research projects and education programs. The annual spending policy is based on the market value of the entire Stanford portfolio, 30% of which was represented by the SIB CDs. Thus, ELECTRI's annual spending policy is based in part on the anticipated interest that would accrue with respect to the SIB CDs. Over the past three years, ELECTRI awarded $2.1 million for twenty-four projects just in research alone. As a direct and proximate result of Defendant Kroll's failure to conduct a reasonable investigation and

its submission of a falsely positive report, ELECTRI's ability to conduct the numerous important research and education projects will be severely limited to the detriment of the entire electrical construction industry.

52. On February 16, 2009, the SEC filed a civil action against SIB, R. Allen Stanford, and other affiliated companies and individual officers and directors, alleging various claims and revealing a "fraud of shocking magnitude."

**The Red Flags That Defendant Kroll Missed Are Numerous and Significant**

53. A February 22, 2009 Washington Post article attached hereto as Exhibit C reported on the numerous advance warnings of the soundness of Stanford entities, stating: "For years, there were red flags—so many they could have massed into a crimson blanket." Ex. C.

54. Similarly, a February 24, 2009 Business Spectator article attached hereto as Exhibit D quoted Mr. William Brittain-Catlin, who upon information and belief is an investigator for Defendant Kroll as of February 2009, and author of Offshore: The Dark Side of the Global Economy: "I'm amazed by the way people were taken in by Sir Allen. There's so much stuff out there that any one who wanted to do a cursory check would have seen. Various allegations have been flying around for years." Ex. D.

55. Defendant Kroll failed to discover and report on these red flags to ELECTRI.

Defendant Kroll Missing Warning Signs Related to SIB

56. The red flags that Defendant Kroll missed and failed to report on with respect to SIB included at least the following:

a. Mr. Stanford and his companies possessed an extensive network of political and financial control on the island of Antigua, a haven for smuggling, money laundering, and fraudulent off-shore accounts. Upon information and belief, Antigua granted Mr. Stanford

citizenship in 1999 and knighted him in 2006. His companies made up nearly 10% of the country's economy. The Antiguan government often relied on Mr. Stanford for funding. In fact, in 2002, Prime Minister Lester Bird turned to Mr. Stanford for millions of dollars in loans. In return Mr. Stanford received tax breaks for his banks and other perks. These facts were public when Defendant Kroll conducted its investigation. Nevertheless, Defendant Kroll never investigated further using its advertised network of confidential sources, nor did Defendant Kroll mention in its Final Report these facts or the associated risk and potential conflict of interest that they presented.

      b. In addition to Mr. Stanford's extensive political network centered on the island of Antigua, Mr. Stanford also had numerous important political ties in the United States. According to the Center for Responsive Politics, as reported in the New York Times, Mr. Stanford and his firm, along with its employees and political action committee, gave $2.4 million in campaign contributions since 2000. Top recipients included Senator Bill Nelson, Democrat of Florida, and Senator John McCain, Republican of Arizona. This information was publicly available when Defendant Kroll conducted its investigation, but Defendant Kroll never investigated further, nor did it mention these contributions or close political ties. In fact, on June 4, 2007, a Defendant Kroll employee advised ELECTRI that there had been "**NO** U.S. political contributions made to any candidates – Levin included, by Stanford or any of his entities."

      c. In 1999, the United States Treasury Department issued an Advisory that warned U.S. banks to scrutinize transactions involving Antigua due to the corrupt regulation of offshore banks. The Advisory was issued as a consequence of Antigua and Barbuda's 1998 amendments to its Money Laundering Prevention Act of 1996. According to a U.S.

State Department assessment, these amendments effectively strengthened bank secrecy, inhibited money laundering investigations and infringed on international cooperation. Similarly, on April 19, 1999, the British Treasury issued a press release stating that it had issued an advisory to financial institutions and warned the world of financial transactions involving Antigua. This information was publicly available when Defendant Kroll conducted the investigation and prepared its Final Report. Although these advisories were lifted in 2001, Defendant Kroll never investigated further using its network of confidential sources, nor did its Final Report mention the initial Advisory or the corrupt financial environment of Antigua.

d. Upon information and belief, Mr. Stanford's role in Antigua, where he had maintained a major presence since 1985, was always an object of scrutiny, particularly to the State Department's Bureau of International Narcotics and Law Enforcement Affairs ("INL"). Although the 1999 U.S. Advisory referenced above was issued as an inter-agency effort between the Treasury and State Departments, INL went to great lengths to focus a negative glare on Antigua and Mr. Stanford.

e. Mr. Tom Cash, Executive Managing Director of Defendant Kroll's Business Intelligence and Investigations division in Latin America and the Caribbean, was hired and paid as a U.S. consultant by Mr. Stanford after Antigua appointed Mr. Stanford to chair a private sector committee to work on the clean up and growth of Antigua's financial sector. Upon information and belief, Mr. Cash was hired shortly before the 1999 U.S. Advisory was issued. Mr. Cash signed the contract on behalf of Defendant Kroll and was the point of contact throughout the investigation of Stanford and the process of finalizing Defendant Kroll's Final Report. Defendant Kroll never disclosed Mr. Cash's connection with Mr.

Stanford and the obvious conflict that this relationship presented. In addition, many of the warning signs related to Mr. Stanford's political network on the island of Antigua and SIB would have been within Mr. Cash's own personal knowledge, but Mr. Cash failed to provide this important information to ELECTRI and instead highly praised Mr. Stanford and Stanford entities.

f. SIB is audited by a small, unknown Antiguan firm, with strong connections to Stanford's financial and political power on the island of Antigua. As one news commentator has noted, C.A.S. Hewlett is a firm that had a very close 25-year relationship with Mr. Stanford, his family, and the Stanford entities. Defendant Kroll never highlighted the small size, lack of experience, or unsophisticated nature of SIB's auditor. Nor did Defendant Kroll report on the close ties between Stanford and its auditor, which cast the auditor's independence into serious doubt. In the SEC Action, C.A.S. Hewlett is described as "a small local accounting firm" based in Antigua, where "no one ever answered the phone" when the SEC called. There is no indication that Defendant Kroll ever attempted to contact C.A.S. Hewlett in connection with its diligence on Stanford.

g. Upon information and belief, Stanford's fraudulent program was used to recruit registered investment advisors with significant books of business, who were then pressured to funnel their clients' assets to Stanford's affiliated CD program.

h. Upon information and belief, Stanford pushed its financial advisors to steer clients' money into the SIB CDs, rewarding the advisors in very nontraditional and suspect ways. Brokers were initially paid a 1% commission fee when they sold the CDs, and they had the opportunity to earn an additional 1% per year over the term of the CDs if they sold at least $2 million worth of CDs in a quarter. In addition, the best producers were often offered

other prizes, including trips, cars, and cash. Some Stanford employees referred to the CD compensation program as "bank crack." Upon information and belief, Defendant Kroll did not further investigate Stanford's investment process with SIB. Defendant Kroll's Final Report did not include any information about the process of investing with SIB, that many of the investors were funneled through brokers that were part of other Stanford entities, or concerning the aggressive commission compensation program. These connections and the red flags raised by these activities should have been included in Defendant Kroll's Final Report, but they were not.

i. Since the Stanford scandal has broken, numerous individuals within the Stanford network, including brokers who sold Stanford SIB CDs, have stated publicly that they were directed and schooled by Stanford not to reveal information regarding Stanford's investment strategy or the reason the SIB CDs had such a high rate of return. Upon information and belief, Charles Hazlett, one of Stanford's top-performing brokers, was never given any information about the SIB CDs, and he was refused even basic information about risk ratings and asset allocation. Hazlett reported that the company lacked detailed balance sheets and used a small, little-known accounting firm. When Hazlett called a meeting with one of SIB's top officers to ask how the investments worked, he was given an ultimatum: resign or be fired. Defendant Kroll should have uncovered this widely-known information through its human network of confidential sources, but Defendant Kroll's Final Report did not mention these facts.

j. Upon information and belief, there has never been a full and accurate explanation as to how SIB could offer such a high rate of return relative to comparable institutions. Defendant Kroll did not investigate further into this missing information or

stress that these suspicious circumstances should be considered heavily in ELECTRI's investment decision.

Defendant Kroll Missed Warning Signs Related to Mr. Stanford and Affiliated Stanford Entities

57.    The red flags that Defendant Kroll missed and failed to report with respect to Mr. Stanford and affiliated Stanford entities included at least the following:

a.    Upon information and belief, Stanford's businesses were inspected and investigated several times by regulatory agencies.  The National Association of Securities Dealers (the "NASD"), now called the Financial Industry Regulatory Authority ("FINRA"), which is the brokerage industry's self-policing group, investigated Stanford's businesses, resulting in penalties for various violations.  One of these violations resulted in the payment of a $20,000 penalty by Stanford **just months before** Defendant Kroll's Final Report was issued.  Specifically, in April 2007, Stanford was cited by NASD for failing to maintain sufficient capital to function properly as a securities brokerage firm.  Industry experts have termed this violation a "major, major, major red flag."  Upon information and belief, Defendant Kroll failed to further investigate these violations.  This violation is not mentioned anywhere in Defendant Kroll's Final Report despite having been public at the time the Final Report was prepared.

b.    SGC had seven arbitration claims filed against it between 2001 and 2007, alleging such claims as various types of fraudulent activity, negligence, misrepresentation, breach of fiduciary duty, omission of facts, and unauthorized trading.  Of the six arbitrations for which disposition was entered prior to the submission of the Final Report, two of the dispositions were against Stanford.  Even though this information was available at the time

Defendant Kroll conducted its investigation, Defendant Kroll failed to investigate further, and its Final Report did not mention any of the arbitration claims or dispositions.

c. In 2006, upon information and belief, a former Stanford employee filed a lawsuit against Stanford, alleging that Stanford ran a Ponzi scheme. This suit was settled out of court, but it was a matter of public record and is nowhere mentioned in the Final Report.

d. Public records reflect that Mr. Stanford and his estranged wife owe the United States $226,645,537.00 in unpaid federal income taxes, including penalties and interest, for tax years 1999, 2000, 2001, 2002, and 2003. The Internal Revenue Service (the "IRS") made assessments and filed notices of liens against Mr. Stanford for his unpaid federal income taxes for tax years 2002 and 2003. The Stanfords filed a petition in Tax Court in 2006 to dispute the deficiency for tax year 1999. Defendant Kroll failed to investigate further, and the Final Report never mentioned this publicly available information.

e. Upon information and belief, as a matter of Stanford policy, information concerning Stanford's investments was kept secret, even from Stanford officers. Upon information and belief, Michael Zarich, Stanford's senior investment officer, told authorities that he did not know where 90% of Stanford's portfolio was invested. He admitted that he was trained "not to divulge too much information" and to deflect questions about the investment strategy and the tiny, Antiguan-based auditor. Defendant Kroll's unique human network and widespread information sources never detected anything suspicious with these practices and the secrecy of information concerning Stanford investments. Indeed, Defendant Kroll failed to further investigate, and these facts are not included anywhere in Defendant Kroll's Final Report.

f. Upon information and belief, the SEC began investigating Stanford's businesses in October 2006. Despite touting its network of confidential sources and unique access to information, Defendant Kroll never mentions this investigation in its Final Report.

g. Defendant Kroll failed to investigate the unexplained high interest rates. Absent a brief reference to the unexplained high interest rates, Defendant Kroll's Final Report made no mention of any of these tell-tale signs of fraud.

## COUNT I
### (Gross negligence)

58. Plaintiff repeats and re-alleges the foregoing allegations and incorporates the same by reference as if fully set forth herein.

59. Defendant Kroll knew or should have known of the significant, clear and present dangers ELECTRI faced with respect to its investment in SIB CDs due to the suspicious circumstances connected with the unexplained high rate of return and offshore banking on the island of Antigua.

60. Defendant Kroll owed a duty to ELECTRI to exercise reasonable care in conducting a due diligence investigation of SIB and its directors, which would necessarily have required inquiry into Mr. Stanford and closely-affiliated Stanford entities.

61. Defendant Kroll was grossly negligent and breached this duty by consciously failing to conduct a thorough due diligence investigation, the objective of which was "to determine from a risk-return evaluation standpoint, if ELECTRI International's investment in Stanford International is a profitable addition," in a wanton and reckless disregard of the consequences to ELECTRI.

62. Defendant Kroll was grossly negligent and breached its duty to ELECTRI by failing to disclose Mr. Cash's relationship and prior employment with Mr. Stanford and include vital

information about SIB in its Final Report that was within Mr. Cash's own personal knowledge due to his employment and relationship history with Mr. Stanford, while Mr. Cash gave only positive reviews of Mr. Stanford and SIB.

63. Defendant Kroll was grossly negligent in failing to engage in a reasonable investigation of the small accounting firm charged with auditing SIB or present any analysis regarding how a firm of that size could provide an accurate and sufficiently independent audit of SIB, which is located on an island clearly under the financial and political control of Mr. Stanford.

64. Defendant Kroll was grossly negligent in failing to report the existence of regulatory citations and two ongoing investigations of SIB and its affiliates and, instead, stating in its Final Report that it "has not found any enforcement actions, disciplinary actions or citations in the name of SIB."

65. Defendant Kroll was grossly negligent in failing to report on Stanford's suspicious investment practices with SIB, specifically that many of the investors were funneled through brokers that were part of other Stanford entities and who materially benefited from an aggressive compensation program if they convinced investors to purchase SIB CDs.

66. Defendant Kroll was grossly negligent in failing to further investigate and report on the lack of information regarding SIB investments, even among Stanford employees; failing to further investigate how SIB could offer a rate of return that was significantly higher than rates offered at comparable institutions; and giving the "green light" to invest in SIB CDs despite the lack of such necessary factual information.

67.  Defendant Kroll was grossly negligent and breached its duty to ELECTRI by failing to inform ELECTRI of numerous red flags about SIB and Stanford-affiliated businesses set forth at length above.

68.  By conducting only a cursory investigation and submitting a report that contained unsubstantiated conclusions, Defendant Kroll engaged in a course of conduct, which a reasonable and prudent person would know would probably and most likely result in injury to Plaintiff.

69.  As a direct and proximate result of Defendant Kroll's wanton breach of the duty it owed ELECTRI and its conscious and reckless disregard for the consequences, ELECTRI has suffered damages in the amount of at least $6,363,455.72.

70.  Therefore, ELECTRI is entitled to damages of at least $6,363,455.72.

71.  WHEREFORE, Plaintiff ELECTRI requests that the Court enter judgment against Defendant Kroll and award Plaintiff ELECTRI appropriate damages in an amount no less than $6,363,455.72 and such other relief as the Court deems just, reasonable, and proper.

## COUNT II
### (Breach of Contract)

72.  Plaintiff repeats and re-alleges the foregoing allegations and incorporates the same by reference as if fully set forth herein.

73.  ELECTRI has performed all obligations required of it under the contract.

74.  Pursuant to the contract, Defendant Kroll was bound to perform as set forth therein.

75.  By its failure to perform a proper due diligence investigation as specifically required under the contract, as set forth above and incorporated herein by reference, Defendant Kroll has breached the contract.

76. Defendant Kroll's failure to honor its obligations under the contract has caused, and continues to cause, ELECTRI harm.

77. Therefore, ELECTRI is entitled to damages in an amount to be determined at trial.

78. WHEREFORE, Plaintiff ELECTRI requests that the Court enter judgment against Defendant Kroll and award Plaintiff appropriate damages in an amount no less than $6,363,455.72 and such other relief as the Court deems just, reasonable, and proper.

## COUNT III
## (Indemnification)

79. Plaintiff repeats and re-alleges the foregoing allegations and incorporates the same by reference as if fully set forth herein.

80. Pursuant to the contract with ELECTRI, Defendant Kroll agreed to the following:

> We agree to hold harmless and indemnify you [ELECTRI] (including your officers, employees and agents) against all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of the Assignment resulting from any actions by us constituting gross negligence, fraud, willful or unlawful conduct or a breach of the terms of this Agreement.

81. Accordingly, Defendant Kroll is obligated to indemnify ELECTRI for its damages and costs, including reasonable attorney's fees and disbursements, resulting from Defendant Kroll's gross negligence and breach of contract.

82. As a result of Defendant Kroll's gross negligence and breach of contract, ELECTRI lost the entire $5,770,000 it had invested as principal in SIB CDs, plus the interest it had earned on the initial SIB CDs from the purchase date through June 25, 2007, the date Defendant Kroll submitted its Final Report to ELECTRI. Accordingly, ELECTRI suffered a total loss of at least $6,363,455.72 as a direct and proximate result of Defendant Kroll's gross negligence and breach of contract.

83. In addition, Plaintiff was forced to bring this current action to try to recoup some of its losses and has incurred substantial attorney's fees and other costs.

84. WHEREFORE, Plaintiff ELECTRI requests that the Court enter judgment awarding Plaintiff indemnification for the damages and costs that Plaintiff has incurred as a result of Defendant Kroll's gross negligence and breach of contract, including all reasonable attorney's fees and disbursements, in an amount to be determined at trial but no less than the $6,363,455.72 that Plaintiff lost from its investment in SIB CDs, plus costs and attorney's fees, and such other relief that the Court deems just, reasonable, and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial of all claims and issues so triable.

Respectfully submitted,

Michael S. Olin (FL Bar No.: 220310)
Michael S. Olin, P.A.
Alfred I. DuPont Building
169 E. Flagler Street
Suite 1224
Miami, Florida  33131
(305) 677-5088
(305) 677-5089 (fax)
molin@olinlawfirm.com

**ATTORNEY FOR PLAINTIFF**


John F. Stoviak, Esq.   (PA Bar No.: 23471)
Candice Toll Aaron, Esq. (PA Bar No.: 3041068)
Jennifer L. Farer, Esq.  (PA Bar. No. 206024)
Saul Ewing LLP
Center Square West
1500 Market Street
38th Floor
Philadelphia, PA 19102
Phone:   215-972-7777

**OF COUNSEL**

# EXHIBIT A

# ELECTRI ⊵ INTERNATIONAL

THE FOUNDATION FOR ELECTRICAL CONSTRUCTION INC.

## FACSIMILE TRANSMISSION

3 BETHESDA METRO CENTER, SUITE 1100 | BETHESDA, MARYLAND 20814-5372
TEL: 301.215.4538 | FAX: 301.215.4536
EMAIL:  LAC@NECANET.ORG

| TO: | THOMAS V. CASH | APRIL 18, 2007 |
|---|---|---|
| FAX: | 305 789 7159 | 5 PAGES INC. COVER |
| FROM: | LAURA CAPUCO, DEVELOPMENT AND OPERATIONS MANAGER | |
| SUBJECT: | ELECTRI INTERNATIONAL | |

Mr. Cash,

A copy of the Engagement Letter follows.  Please note page 2; Confidentiality section.  The revised copy corrected the first sentence but omitted the last sentence of this section.  It seemed easiest to simply make a hand correction to the original and have Russ initial the change.

Our accounting department will be processing the wire transfer tomorrow morning.  I will still notify you by email as soon as our bank receives the wire instructions.

*Laura*

# KROLL

*Client Work Product*
*Private & Confidential*

April 13, 2007

Mr. Russell J. Alessi
President
ELECTRI International
3 Bethesda Metro Center, Suite #1100
Bethesda, MD  20878

Mr. Alessi,

We are pleased to confirm your engagement of Kroll Associates, Inc.

1.    Services

You have asked us to perform a Due Diligence/Reputational investigation concerning what is known as Stanford International Bank, Antigua.

We understand that ELECTRI International ("the Client") wishes to determine the subject's reputation and if the institution is in compliance with International banking regulations is being managed in a professional manner, or is the subject of any legal actions by the Antiguan or other governments.

We also understand that ELECTRI International has a specific interest in Kroll's opinion of Stanford International as in comparison to other US and International banks of the same size. The objective of the investigation is to determine, from a risk-return evaluation standpoint, if ELECTRI International's investment in Stanford International is a profitable addition.   Our methodology for this investigation is described below.  We will conduct the investigation in compliance with all applicable laws and regulations.

2.    Methodology

In conducting an investigation of this nature we will:



1/ Search media and other reference sources to identify any adverse media or negative indicators as to the institution's reputation

2/ Review independent and regulatory audits and examinations that determine the soundness of the institution and their compliance with regulatory requirements

3/ Review bank year-end reports and analyzing income statements and balance sheets.  We will also be reviewing the bank's credit risk and interest rate risk.

4/ Contact members of Kroll's human bankers network who are familiar with Caribbean Banks in particular.

5/ Conduct litigation checks to determine whether or not the bank or Mr. Stanford in Antigua are the subject of any legal actions

6/ Contact local and federal law enforcement agencies to determine whether or not this bank is under any significant investigative suspicion for criminal acts or money laundering by the bank, or any of their employees or executives.

Rev. 9/06

1

# KROLL

*Client Work Product*
*Private & Confidential*

We anticipate that this assignment will take a total of fourteen (14) working days.

Should it be necessary, any additional assignments outside the above stated parameters of this assignment, and accepted by us, will be set forth in a supplementary writing which references to this Agreement, and which sets forth the charges for our services, and is signed by both of us.

These assignment requests may take the form of telephone calls, fax, or e-mail. If by phone, for clarity, these contacts should be followed up with a brief written request of what is needed.
During the course of the Assignment, please let us know promptly if you have any questions at any time about any aspect of our services for you.

3.    Engagement Terms

If any person or entity requests or subpoenas any information or materials relating to the Assignment which are within our custody or control (or the custody or control of any of our agents or representatives), we will inform you of such request or subpoena. Should you require us to take any legal action to seek protection against disclosure of such information or materials, you will either retain legal counsel to represent us or will indemnify us for all costs and expenses, including reasonable attorney's fees and disbursements, resulting from such action.

You agree to hold harmless and indemnify us (including our officers, employees and agents) against all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of the Assignment, except for such claims, damages and costs resulting from any actions by us constituting gross negligence, fraud, willful or unlawful conduct or a breach of the terms of this Agreement. We agree to hold harmless and indemnify you (including your officers, employees and agents) against all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of the Assignment resulting from any actions by us constituting gross negligence, fraud, willful or unlawful conduct or a breach of the terms of this Agreement.

You agree, as well as any other party acting on your behalf each agrees (and their agreement should follow), that neither we, our affiliates, our representatives nor our employees will be liable for any claims, liabilities or expenses relating to this engagement for an amount in excess of the aggregate amount paid by you to us pursuant to this engagement, except to the extent resulting from our gross negligence, fraud, willful or unlawful conduct. In no event will we or our affiliates, our representatives or our employees be liable to you for consequential, special, indirect, punitive or exemplary losses, damages or expenses relating to this engagement.

4.    Confidentiality

You agree that reports and information *internal* received from us will be treated as confidential and are intended solely for your private and ~~exclusive~~ use, ~~except with our prior written consent.~~ We agree to maintain the confidentiality of all confidential or proprietary information received from you.

Rev. 9/06

# KROLL

*Client Work Product*
*Private & Confidential*

5.    Fees and Charges

We have agreed that the charge for our professional services for the Assignment will be $15,000.00. We have agreed upon this amount based on a number of factors.

Additional charges will include out-of-pocket expenses and an allocation of administrative service costs equal to 7% of the amount charged for professional fees to cover costs not directly billable such as telecommunications, reproduction and other administrative costs.

You have agreed to pay us a retainer of $7,500.00. You will be billed on a monthly basis with the retainer amount applied to the final invoice at the completion of the engagement.

Database usage fees will be included as an expense item and are calculated by multiplying our database rate times the actual number of minutes spent on the engagement. The usage fees of other databases not included in our regular on-line menu will be captured and charged at standard provider rates.

We intend to provide invoices to you on a monthly basis. Payment of our invoices is due promptly upon receipt and any unpaid balances will accrue interest at the rate of 12% per annum from 30 days after the date of each invoice. We reserve the right to terminate our services at any time if you fail to pay our invoices in a timely manner. If it becomes necessary to incur expenses in order to collect the fees and expenses owed us, you agree to reimburse us for such expenses, including reasonable attorney's fees.

WE WILL BEGIN OUR WORK PROMPTLY AFTER RECEIPT OF YOUR EXECUTED ENGAGEMENT LETTER AND CHECK FOR THE RETAINER. WE RESERVE THE RIGHT TO TERMINATE THE ASSIGNMENT IF THIS ENGAGEMENT LETTER IS NOT SIGNED AND RETURNED TO US [TOGETHER WITH YOUR CHECK FOR THE RETAINER] WITHIN THREE BUSINESS DAYS.

6.    Taxes

Certain of our services may be subject to Florida State sales taxes when oral or written reports are delivered by us in Florida State sales taxes may be applicable in other states and localities as well. Where divisible, fees for taxable services will be detailed separately from those for non-taxable services.

7.    Data Disclaimer

On June 25, 2001, the US Supreme Court decided that the inclusion of articles from freelance authors in electronic databases without copyright transfer was an infringement of the 1976 Copyright Act (*New York Times v. Tasini*). Therefore, it is possible that certain articles written by freelance authors between 1976 and 1995 might not be included in our news databases. However, Kroll has online subscriptions to thousands of local and global news sources and will provide comprehensive research drawing upon these numerous and diverse information sources.

8.    Conflicts

We request you to agree that our representation of you in the current discrete matter does not prevent us from providing future services to clients adverse to you on matters not substantially related to this current discrete matter.

# KROLL

*Client Work Product*
*Private & Confidential*

\*\*\*

This Agreement shall be effective as of the date on which we first provide services to you. If this letter is satisfactory to you, kindly execute and return the enclosed copy together with your check for the retainer. We look forward to working with you.

Sincerely,

**KROLL, INC.**

*THOMAS V CASH*

By:_____

Thomas V. Cash
Executive Managing Director

AGREED TO AND ACCEPTED:

**ELECTRI INTERNATIONAL**

By: _____

Mr. Russell J. Alessi
President

Kroll Associates, Inc. is licensed by the **Florida**
Department of State, Division of Licensing Services.

Rev. 9/06

4

# EXHIBIT B

June 25, 2007

# ELECTRI International

## Stanford International Bank
## Russell J. Alessi

## KROLL

MMC Companies

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

# Restricted Use Warning

This report was prepared by Kroll Associates, Inc. ("Kroll") at the request of the client to whom it is furnished.  This report shall be treated as confidential.

The client may provide copies of this report only to regulators and other financial institutions who request proof of independent compliance reviews, but they themselves must abide by these confidentiality clauses and restricted use warning.

Under no circumstances shall the third party recipient of this report, including its directors, officers, or employees, disclose or make public in any manner the report or any portion thereof without the express and written consent from Kroll.

Any other use and any communication, publication or reproduction of the report or any portion of its contents without the written consent of Kroll is strictly forbidden.  The client agrees to indemnify and hold harmless Kroll against any damages or claims resulting from such unauthorized use.

**KROLL**    Stanford International Bank    *Attorney Client Work Product*
*Privileged and Confidential*

# Contents

RESTRICTED USE WARNING ...................................................................................................I

INTRODUCTION ........................................................................................................................1

METHODOLOGY ........................................................................................................................2

EXECUTIVE SUMMARY .............................................................................................................3

   STANFORD INTERNATIONAL BANK, LTD ............................................................................3
   MANAGEMENT TEAM .........................................................................................................4
      *Juan Rodriguez-Tolentino, President* .........................................................................5
      *Michael J. Zarich, Vice President and Senior Investment Officer* ................................5
      *Pedro E. Rodriguez, Vice President and Senior Compliance Officer* ...........................5
   BOARD OF DIRECTORS .......................................................................................................5
   MONEY MANAGERS/INVESTMENT ADVISORS .....................................................................6
   INVESTMENT POLICY/PARAMETERS ...................................................................................6
   POSITION LIMITS ..............................................................................................................6
   INVESTMENTS ...................................................................................................................6
   FINANCIAL STATEMENT .....................................................................................................7
   REGULATORY MATTERS .....................................................................................................7
   LITIGATION .......................................................................................................................9
   COMMUNITY RELATIONS ...................................................................................................9
   RISK CONSIDERATIONS .....................................................................................................9
   CRITICS' & COMPETITORS' VIEWS ON OFFSHORE ENVIRONMENT .......................................10

**KROLL**          Stanford International Bank          *Attorney Client Work Product*
*Privileged and Confidential*

## Introduction

Kroll was asked by ELECTRI International ("the Client") to perform a Due Diligence/Reputational Investigation on the entity known as Stanford International Bank, LTD, Antigua.

ELECTRI requested that Kroll determine the reputation of Stanford International Bank and if the institution was in compliance with international banking regulations, and/or is managed in a professional manner. The Client also wanted to know whether or not Stanford International Bank was the subject of any legal actions by the Antiguan government or any other government or regulatory agencies.

Kroll also understood that the Client solicited Kroll's opinion of Stanford International as it compares to other U.S. and International banks of similar size. The objective of the investigation was to determine, from a risk return evaluation standpoint, if ELECTRI International's investment in Stanford International is a profitable addition.

**KROLL**       Stanford International Bank       *Attorney Client Work Product*
*Privileged and Confidential*

## Methodology

In accordance with the Letter of Engagement between Kroll and the Client, Kroll conducted the investigation by conducting over a dozen interviews with domestic and international bankers and analyzed available public data and obtained highly confidential information unavailable to the public. In addition, Kroll contacted equity and bond sources and analyzed Stanford International Bank activity in relationship with global trends and internationally accepted banking activities and practices. These steps of methodology are outlined in the LOE as:

- Searched media and other reference sources to identify any adverse media or negative indicators as to the institution's reputation

- Reviewed independent and regulatory audits and examinations that determine the soundness of the institution and its compliance with regulatory requirements

- Reviewed bank year-end reports and analyzed income statements and balance sheets. Kroll also reviewed the bank's credit and interest rate risk.

- Contacted members of Kroll's human bankers network who are familiar with Caribbean banks in particular

- Conducted litigation checks to determine whether or not the bank or Mr. Stanford in Antigua are the subject of any legal actions

- Contacted local and federal law enforcement agencies to determine whether this bank is under any significant investigative suspicion for criminal acts or money laundering by the bank, or any of their employees or executives

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

## Executive Summary

This report reflects the following information:

- SIB has been in business since 1985
- SIB has had the same money managers for 15+ years
- SIB retains discretion over investment decisions
- They are subject to Antiguan and Canadian regulatory authorities
- No disciplinary history
- No pertinent litigation
- No negative information from FATF or law enforcement
- SIB is considered an investment bank, not a commercial bank
- Basel I compliant and claim to be Basel II compliant by end of 2007
- Report to have been found largely compliant by the IMF
- No negative findings by Senator Levin
- SIB and Allen Stanford prime promoter for cash deposit prohibition

- Regulatory standards in Antigua are not as high as in the U.S.
- With higher rates comes higher risk

## Stanford International Bank, LTD

The Stanford International Bank, LTD ("SIB") is located on the island of Antigua. It is a member of Stanford Private Wealth Management, which is a financial services network reported to have $26 billion in deposits and assets. SIB is an international bank that specializes in private banking. They report to currently serve 42,000 clients in 136 countries.

SIB was established in 1985 on the island of Montserrat-BWI under the name of Guardian International Bank. In 1990, the bank moved its operations to Antigua, W.I. and the name were changed to Stanford International Bank in 1994.

SIB is wholly owned by Stanford International Bank Holding, LTD., which in turn is owned 100% by Allen Stanford. SIB currently holds $5,336,317,447 in assets. Throughout its 20-year history, SIB has retained a network of money managers who, with limited discretion, direct the investment of SIB's assets. None of the bank's assets are managed in-house. SIB's Chief Investment Officer, Michael Zarich, oversees the investment management of the bank's assets, and reports to its Board of Directors. The Board of Directors along with analysts from the Stanford Group determines the investment strategy for the bank and reviews it quarterly.

As an issuer, SIB ascribes to a "value-driven" philosophy, and focuses its investments primarily in North America and Western Europe. However, SIB also looks for appropriate investment opportunities in Eastern Europe, Asia, Latin America and other regions. SIB's primary investment objectives are preservation of principal and capital growth. It should be noted that SIB is not involved in management of any of its investments, which are made only for investment purposes.

**KROLL**    Stanford International Bank    *Attorney Client Work Product*
*Privileged and Confidential*

SIB is chartered as an international bank, and can engage in any lawful banking activity. The bank is only restricted from doing business with residents of Antigua and Barbuda or members of the royal families, and from trading in CARICOM currency.

In December 2004, SIB announced the opening of a representative office in Montreal, Canada. This was the first license to a representative office that Canada has granted to an independently owned bank in nearly 10 years.

Kroll has checked with Financial Action Task Force (FATF) sources, confidential law enforcement sources in Antigua and Barbuda, and U.S. law enforcement sources. In both Federal and State jurisdictions, no negative information was discovered.

Florida International Bankers Association (FIBA) sources and Caribbean bankers are consistent in their comments that SIB interest payments exceed those of some other institutions in the Caribbean region. These banking sources, who are also competitors of SIB, continue to insist that there is no reasonable explanation for such positive returns.

SIB is an Antiguan bank held to Antiguan banking standards and regulations. Even though the standards are not those of U.S. banks, SIB is subject to reviews, examinations and even punishments if these regulations are not followed. The most important aspect of any regulated bank is that they are following "safe and sound" banking practices. The extent of these practices are not limited by the regulations, but should follow those of the moral character of the people running the bank.

In summary, SIB is a traditional bank, in Antiguan standards, which handles its assets through an investment portfolio. SIB regards itself as a bank in the nature of UBS or Wachovia and, in the context of its asset allocation model, most Swiss banks. It should be noted that in form of products, SIB is an Investment Bank, not a commercial bank.

## Management Team

The SIB includes the following persons in its management team:

Juan Rodriguez-Tolentino, President
Miguel Pacheco, Senior Vice President
Alain Lapointe, Senior Vice President, Montreal
Eugene Kipper, Vice President
Michael J. Zarich, Vice President and Senior Investment Officer
Pedro E. Rodriguez, Vice President and Senior Compliance Officer

**KROLL**     Stanford International Bank     *Attorney Client Work Product*
*Privileged and Confidential*

### Juan Rodriguez-Tolentino, President

Juan Rodriguez-Tolentino has been with SIB since 1992. He was formerly with the Bank of Boston and the Bank of Nova Scotia. He is well educated with degrees in management, economics and banking management operations. He is CAMS certified as an anti-money laundering specialist.
Juan Rodriguez-Tolentino received the Anthony Michael Award for outstanding contribution and dedication to The Rotaract Club of Antigua and Barbuda for the 2004-2005 year.

### Michael J. Zarich, Vice President and Senior Investment Officer

Michael K. Zarich has been associated with Stanford Private Wealth Management since 1999, first as Managing Director of the Investment Advisory Group at Stanford Group Company, an affiliate of SIB, then as Senior Investment Officer of SIB. Zarich is responsible for overseeing the investment management of the bank's assets, reporting directly to its Board of Directors, and its President, Juan Rodriguez-Tolentino. Specifically, Zarich conducts his oversight in four key areas, and is charged with ensuring that: (1) the investments are in line with the bank's investment policy statement; (2) the investments achieve their target returns on an annual basis; (3) the bank follows its own policies and procedures, employs the proper risk controls, and adheres to its regulatory requirements; and (4) the bank meets its capital adequacy test on an ongoing basis.

### Pedro E. Rodriguez, Vice President and Senior Compliance Officer

Pedro E. Rodriguez has been in banking since 1972 and has held compliance officer and internal auditor positions in many international banks. He has degrees in finance and accounting and is recognized as a Certified Regulatory Compliance Manager. It is his job to assure that the bank maintains adherence to the International Business Corporation Act (IBCA) of 1982, and the Money Laundering Prevention Act (MLPA) of 1998 (amended in 1999 and 2000).

## Board of Directors

SIB's current Board includes:

James A. Stanford, Chairman Emeritus
Sir R. Allen Stanford, Chairman
O.Y. Goswick, Investments
Kenneth C. Allen, Q.C., Secretary and Treasurer
Sir Courtney N. Blackman, Ph.D., International Banking
Robert S. Winter, Director
James M. Davis, Chief Financial Officer

Kroll could not find any adverse publicity regarding the bank's Management Team or Board of Directors.

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

## Money Managers/Investment Advisors

The bank does not disclose the identity of the individuals or entities it retains to invest its assets. SIB has used most of its money managers for the past 15 years or more (and some have been with the bank since its inception), and all are well-established private banks such as Credit Suisse.

## Investment Policy/Parameters

The bank adheres to these general parameters regarding asset allocation: a minimum of 10% in cash or cash equivalents; no more than 50% in equities; 70% in fixed income (90% of which must be investment grade); and 20% in precious metals. The bank invests in a diverse product mix across these categories, including currencies, commodities, real estate funds such as REITs, funds of funds, and hedge funds. It also invests in various sectors and industries, and does not focus on any one particular area of business.

## Position Limits

Position limits are reviewed and set weekly by the bank's Board of Directors. In general, position limits are a risk management tool used to reduce the risk exposure on both intra-day and overnight positions. Position limits refer to the maximum position that the bank will hold or control in a particular investment or type of investment. Various factors can be considered in the calculation of position limits, which, in the case of SIB, are determined internally by the bank's Board of Directors.

In addition to position limits, the bank imposes certain parameters for determining whether to divest from certain positions – 80% on the downside, and a range from 10%-16% on the upside. The bank's advisors also make use of stop orders and the like to minimize potential losses in the event of a catastrophic or unusual market or world events.

## Investments

SIB does not publicly disclose its specific investments, with the exception of publicly U.S. traded companies in which it acquires an interest of five percent or greater. As of April 4, 2007 (the most recent reporting date), SIB holds at least 10% of the shares of common and/or convertible preferred stock in the following companies:

1. Forefront Holdings, Inc. (formerly Datrek Miller International, Inc.)-a Florida sporting goods company (FOFH:OTCBB)

2. Health Systems Solutions Inc.—a Florida pre-packaged software services company (HSSO:OTCBB)

3. Elandia, Inc.—a Florida telephone communications company (no symbol)

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

4.  Superior Galleries Inc.—a California jewelry, watch, and precious stones and metals wholesaler (SPGR:OTCBB)

5.  American Leisure Holdings Inc.—a New Jersey transportation services/travel company (AMLH:OTCBB)

## Financial Statement

The 2006 Annual Report is now available on the SIB website. This annual report includes the 2006 Financial Statement of SIB. The Income Statement for FYE 12/31/06 reported total revenues (investment income) of $479 million (USD) compared to approximately $323 million in FYE 2005. SIB reported that it earned $28.8 million on said revenues as operating profit. This compares unfavourably with 2005 results of $35.9 million. In FYE 2006, SIB reported total loans and other financial assets of $5.3 Billion (USD) contrasted against $5 Billion in deposits from clients. Total Shareholder Equity was reported to be $311 million.

The Financial Statement includes a statement from independent auditors, C. A. S. Hewlett & Co. Ltd., Chartered Accountants St. Johns Street, St. Johns, Antigua, whish states:

"In our opinion, the financial statements are fair in all material respects, and they show a true position of the company as at 31 December 2006, and the results of its operations and its cash flow for the year in accordance with international financial reporting standards."

## Regulatory Matters

The bank is subject to regulation by the Financial Services Regulatory Commission of Antigua and Barbuda (FSRC), as well as the Office of the Superintendent of Financial Institutions of Canada (OSFI). The OSFI publishes guidelines, which are essentially best or prudent practices that it expects financial institutions to follow. Guidelines are used to set standards to govern industry activities and behavior. These include solvency standards (capital adequacy), prudential standards (large exposure limits, portfolio mix), and accounting standards (e.g., non-accrual loans, transfer of assets, etc.), which vary according to the particular type of institution, its size, customer base, etc. Accordingly, in applying for membership with the OFSI, SIB was required to establish a certain minimum capital and adhere to certain accounting standards. In addition, by becoming a member it subjected itself to additional regulatory scrutiny.

The bank has no regulatory disciplinary history, and is subject to a "safety and soundness" review every 12 months by the FSRC. The bank files with FSRC quarterly reports with attached balance sheets, profit/loss statements, and other relevant attachments. SIB files a yearly report with the OSFI, but is primarily regulated by the FSRC.

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

In addition to regulatory reviews, the bank retains independent auditors—who are appointed by the Board of Directors and approved by the FSRC—to conduct reviews and provide the bank with audited financials on an annual basis. SIB has a minimum capital requirement of five percent to assets.

Although Kroll was not given permission to view the regulatory examinations and internal audits, SIB has reported that they are Basel I compliant, and are in the process of implementing Basel II and anticipates being fully compliant by December 2007.

The Basel Committee on Banking Supervision is made up of representatives from 13 countries including Canada and the United States. (Antigua is not a member) It was established in 1974 to promote the supervision of internationally active banks. In 1988, the Basel Capital Accord, Basel I, represented the agreement of its members on issues such as how capital is calculated, how the risks against which capital is held are evaluated, what the ratio of capital to risk should be, and a timetable international banks would use toward meeting that ratio. The standards were designed to promote the stability of international banks and encourage competitive equality among them with respect to the capital obligations they must meet. Basel I was also concerned with issues surrounding capital requirement.

A proposal was issued in 2001, Basel II, that would allow flexibility by allowing a bank to select from various options a capital structure that matches the complexity of the bank's operations. Second, Basel II includes new procedures under which supervisory agencies would review a bank's internal processes for the purpose of insuring that capital and risks are properly evaluated and structured and third, would require disclosure of capital and risk status for the benefit of market participants.

SIB also reports that the bank has been examined by the IMF and was found to be largely compliant. Kroll has not found any enforcement actions, disciplinary actions or citations in the name of SIB.
Kroll has attempted to obtain copies of regulatory audits and examinations. Our latest information is that the Antiguan government has determined that it is unlawful for participating banks to release copies of these documents. In response to this decision, Kroll contacted Mr. Leroy King, Administrator and CEO of the Financial Services Regulatory Commission (FSRC).

Prior to his appointment in June 2002 as Administrator of the Financial Services Regulatory Commission, Mr. King held the positions of Advisor to the Minister of Finance and Special Envoy in the Ministry of Foreign Affairs. In 1999, he was appointed Ambassador at Large in the Ministry of Foreign Affairs.

Mr. King has spent over 20 years in banking in the United States of America. Most of those years were spent working at Bank of America in various capacities. Mr. King has been the Chairman of the Social Security Board since 1999.

Mr. King holds a MBA in Finance, a MSC in Advanced Business Studies, a BBA in Accounting and a BBA in Finance and Economics from Iona College, New York. Mr. King also holds a Post Masters Certificate in Taxation.

**KROLL**          Stanford International Bank          *Attorney Client Work Product*
*Privileged and Confidential*

In a telephonic interview, Mr. King was very complementary to SIB and Mr. Allen Stanford. He stated that if SIB were a U.S. Bank, in his opinion, "it would be pushing AAA" and was "a first class institution". Mr. King explained that all international banks in Antigua are audited internally and examined every year.  He also stated that compliance with Basel 1, and soon to be Basel II, are requirements of Antiguan law.

Kroll did receive a faxed statement from Mr. King, on FSRC letterhead, which states that SIB "is examined annually for safety and soundness as well as to ensure compliance with the International Business Corporations Act and its Regulations, the Money Laundering Prevention Act and its Regulations and the Prevention of Terrorism Act 2005".  The statement reflects that the most recent examination conducted on SIB was April 2006. Mr. King states that "the Stanford International Bank, Ltd....is in good standing with the Financial Services Regulatory Commission".

SIB is a member of the Bankers' Association for Finance and Trade (BAFT). Established in 1921, BAFT is a financial trade association made up of financial institutions and companies worldwide who make important contributions to the global financial community.  Since July 2002, BAFT has also become an affiliate member of the American Bankers' Association (ABA).  As part of its BAFT membership, SIB is also an affiliate member of the ABA.

## Litigation

During the past five years, the bank has not been involved in litigation alleging any wrongdoing in customer accounts; however, the bank has been a party in civil disputes involving its refusal to disclose customer information, and one local title dispute regarding land acquired by the bank that began in 1995, in which judgment was entered on November 20, 2006.  This was a land judgment of an appeal to the Court of Appeals.  It is open to appeal as the next level has been granted to the bank and is pending at this time.

## Community Relations

SIB, along with the Bank of Antigua, is very active in the Antigua community.  SIB supports the Antigua Rotary Club Junior Achievement Program and sponsors the "Antigua Sailing Week" event.  In addition, it sponsors the national cricket team of Antigua and Barbuda.

## Risk Considerations

Since 2001, Carl Levin, the U.S. Senator from Michigan has been working to control money laundering through U.S. Banks.  On February 17, 2007, Senator Levin, along with Senator Norm Coleman from Minnesota and Senator Barack Obama from Illinois, introduced legislation to stop offshore tax haven and tax shelter abuses.  They compiled a list of what the U S Congress believes are "Offshore Secrecy Jurisdictions", which includes Antigua and Barbuda.

# KROLL

Stanford International Bank

*Attorney Client Work Product*
*Privileged and Confidential*

Since Senator Levin began his crusade, he has made public mention of nearly every bank in Antigua, focusing on the Swiss American Bank of Antigua. It has been reported that he reviewed the Stanford International Bank and made no negative findings. No other bank has been spared Levin's negative allegations to date.

The Cayman Islands, Bermuda, the Bahamas and Granada are the most talked about tax havens, but Antigua and Barbuda is also frequently named in that regard. However, in 1999, Antigua was the first financial center to prohibit deposits in cash or with bearer negotiable instruments. This was done to eliminate the possibility of anonymous cash deposits coming into the Antiguan banks. SIB was the prime promoter of this policy, which was considered a bold move at that time. Allen Stanford took a strong and unpopular public position in adopting this policy.

SIB is considered an "offshore" bank. Many banking experts agree that offshore banking is an important part of the international financial system. These experts believe that as much as half of the world's capital flows through offshore centers. The International Monetary Fund (IMF) reports that between $600 billion and $1.5 trillion of illicit money is laundered annually, equal to 2% to 5% of global economic output. Today, offshore is where most of the world's drug money is allegedly laundered, estimated up to $500 billion a year. If the proceeds of tax evasion are included, that figure increases to $1 trillion per year. Given these published opinions, offshore banks are alleged by many to be "Risk" banking locations for depositors who are sophisticated investors.

## Critics' & Competitors' Views on Offshore Environment

Although banking in Antigua offers higher interest rates than those available in the U.S., with higher rates comes a higher risk. While it is true that Antigua is highly regulated and its banks are required to be compliant with international banking standards, the standards are not as high as those of U.S. regulated and insured institutions. Competitors and critics allege that it is impossible to pay the higher interest rates earned by clients of SIB. Their arguments are valid, only to the extent that U.S. regulations require "approved investments" which are not required by the Antiguan regulatory agencies.

That being said, Kroll believes that SIB has a solid history, with no adverse publicity, litigation, or regulatory concern regarding the management of its customer funds and assets. However, given the nature of the bank and the fact that it is less stringently regulated, it is inherently a greater risk.

# KROLL

1200 Brickell Avenue
20th Floor
Miami, FL 33131
305 789 7100

MMC Companies

# EXHIBIT C

Case 1:09-cv-21385-PCH   Document 1   Entered on FLSD Docket 05/22/2009   Page 48 of 52
SEC probed Stanford companies; red flags abounded
Page 1 of 4

# The Washington Post

## SEC probed Stanford companies; red flags abounded

By MARCY GORDON
The Associated Press
Sunday, February 22, 2009; 9:01 PM

WASHINGTON -- For years, there were red flags _ so many they could have massed into a crimson blanket.

As with the Bernard Madoff case, the scandal surrounding billionaire R. Allen Stanford now seems clear and obvious in hindsight. Yet Stanford managed to run his alleged scheme even while the Securities and Exchange Commission and other regulators had him on their radar screens and investigated his businesses. Stanford wasn't charged until last week.

From his tiny accounting firm's office near a North London fish-and-chips shop to certificates of deposit promising outsized returns sold by a bank in Antigua, ample warning signs over the years suggested Stanford's business wasn't what it seemed.

Among them:

_A finding by regulators in June 2007 that Stanford's company lacked enough capital to function properly as a securities brokerage firm. The company paid $20,000 to settle charges by the National Association of Securities Dealers without admitting or denying them.

_Stanford's businesses were inspected and investigated several times, starting in 2006 by the SEC and in 2004 by the NASD, the brokerage industry's self-policing group, now called the Financial Industry Regulatory Authority, or FINRA. NASD's scrutiny resulted in several disciplinary actions: the regulator fined his brokerage company four times, with penalties totaling $70,000, for violations that included misleading investors in sales materials about the risks of the CDs.

_A 2006 lawsuit by a former employee alleging that Stanford's company ran a Ponzi scheme. Two other ex-employees asserted in a suit in January 2008 that Stanford's Antigua bank, Stanford International Bank Ltd., sold CDs based on inflated returns and had destroyed documents.

_A board of directors that included Stanford's father, his college roommate and a family friend who remained on the board years after suffering a debilitating stroke.

_The Antigua-based accounting firm that audited the offshore bank was tiny and little known.

_A 1999 Treasury Department advisory that warned U.S. banks to scrutinize transactions involving Antigua. It said a new regulator in Antigua was essentially a captive of offshore banks it was meant to supervise. (The advisory was lifted in 2001.)

Last week, the SEC accused Stanford in a civil lawsuit of a "massive" fraud. It said he peddled sham promises and funneled investors' money into real estate and other assets not easily turned into cash. FBI agents in Houston are running a parallel investigation.

Stanford, who was served legal papers by FBI agents last week, hasn't been charged with any crime.

The SEC began investigating Stanford's businesses in October 2006 but was asked by another, unidentified federal agency to suspend its inquiry, an SEC official in Texas told news organizations last week.

"This was an active investigation throughout and it was going on for some time," John Nester, an SEC spokesman in Washington, said Sunday. He wouldn't confirm that the investigation began in October 2006 or identify the other agency. But he said there were complexities in the probe, such as issues of foreign jurisdiction and the SEC's cooperation with other federal agencies, including some with criminal authority.

The SEC is looking into Stanford's regulatory history to be able to respond to media inquiries about the background of the case but not as a review of the agency's handling of it, Nester said.

Coming after the Madoff scandal, the case of another politically connected financier accused of a global fraud has deepened doubts about the SEC's oversight of such cases.

And it's led some to wonder whether the SEC chose to fast-track its case against Stanford only after the uproar over its failure to detect the alleged Madoff fraud. SEC investigators began interviewing Stanford employees in January, just weeks after Madoff's arrest.

"This is another black day for the SEC, unfortunately," said James Cox, a Duke University law professor and securities law expert. "It's deja vu all over again."

The lawsuit filed in 2006 by ex-Stanford employee Lawrence DeMaria was settled out of court. The suit brought in January 2008 by two financial advisers at Stanford International Bank has entered arbitration proceedings before FINRA. The bank claims that the advisers owe money it advanced to them.

Parallels between the Stanford and Madoff cases are striking.

The swashbuckling Stanford, 58, with a personal fortune pegged at $2.2 billion by Forbes magazine, allegedly attracted $8 billion in investors' money. He donated to campaigns of U.S. lawmakers and bankrolled public works and sports teams. He was knighted in Antigua.

Stanford's enterprises in Antigua include a newspaper, restaurants, a development company and the ornately landscaped Stanford cricket grounds. Stanford owns private jets and homes in Antigua, Texas, Florida and the U.S. Virgin Islands, and runs businesses from Houston to Miami to Antigua to Switzerland.

He lured investors from Latin America who worried about stability in their home countries or currencies.

As for Madoff, he was long a high-powered figure on Wall Street, a former chairman of the Nasdaq Stock Market who served on SEC advisory committees.

He owns homes in New York and Palm Beach, Fla. In attracting an alleged $50 billion, Madoff solicited investments from charities, banks and European aristocrats.

A whistleblower, Harry Markopolos, had raised red flags to the SEC about Madoff starting 10 years ago.

But the stature of a Madoff "casts a glow around the person that might cause you to put your guard down a bit as a regulator," said Mercer Bullard, head of a mutual fund watchdog group and a former SEC attorney.

As with Stanford's offshore bank, Madoff's auditor was a no-name firm, run out of a drab building in a New York City suburb.

"That's one of the tests," Bullard said. "You look at the accountants."

Both Stanford's and Madoff's businesses had undergone investigations and inspections by the SEC and the predecessor of FINRA.

FINRA spokeswoman Nancy Condon said the two agencies' Stanford investigations ran parallel to each other, "and at some point, both of us became aware of each other." FINRA has said it lacked jurisdiction over Stanford's investment business run by the offshore bank because it wasn't a securities brokerage operating in the U.S.

The regulator's oversight covered advertising material for Stanford's CDs but not for the financial products themselves sold by the bank, FINRA says.

FINRA said Sunday, in a statement in response to questions: "It became apparent early in our review that, as it was in 2007, our jurisdictional inability to reach certain aspects of the Stanford businesses and personnel likely would interfere with, if not stymie, our investigation. That, plus the breadth of the SEC's recent action, has led us to stay our investigation for the time being."

Though they aren't named in the SEC's complaint, regulators said Allen Stanford was helped in running the Antigua-based operation by his 81-year-old father, James, and by another resident of Mexia, Texas, described on the company Web site as an "active investor and cattle rancher."

But that man, O.Y. Goswick, 85, suffered a stroke in 2000 and hasn't been able to speak, according to his son, Richard. Richard Goswick said the two older men became board members in the company's infancy and were kept on through the years.

A bank's board is supposed to oversee management. But only two board members _ Allen Stanford and James Davis, his college roommate _ knew how the money was invested, the SEC alleges.

—

AP Business Writer Daniel Wagner in Washington contributed to this report.

© 2009 The Associated Press

**Ads by Google**

**Stanford Ponzi Scheme**
Leading securities law firm assists defrauded investors. Free review.
www.LieffCabraserSecurities.com

**Stanford Fraud Lawyers**
Helping Investors Recover Losses Free Consultation
www.feldmangetz.com

**Anti-Money Laundering**
Industy leading anti-money laundering services
www.daylightforensic.com

℆JS 44  (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

ELECTRI INTERNATIONAL - THE FOUNDATION FOR ELECTRICAL CONSTRUCTION, INC.

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

MICHAEL S. OLIN, ESQ., MICHAEL S. OLIN, P.A. 169 East Flagler Street, Suite 1224, Miami, FL 33131, (305) 677-5088

### DEFENDANTS

KROLL INC. and KROLL ASSOCIATES, INC.

County of Residence of First Listed Defendant  Miami-Dade County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | ☑ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 09cv 21385 - King/Bandstra

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed-(see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO      b) Related Cases ☐ YES ☑ NO

JUDGE                    DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

Breach of contract / gross negligence claims.

LENGTH OF TRIAL via  15  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
May 21, 2009